## BEARDSLEY *vs.* MAYNARD.

In an action for a libel, the defendant cannot either in bar of the action, or in mitigation of damages, give in evidence other libels published of him by the plaintiff not distinctly relating to the same subject.

If the publication alleged to be libellous was in answer or reply to a previous publication by the plaintiff, it seems, that such previous publication would be received in evidence in mitigation of damages ; but a criminatory retort in which no relation to or perceptible connection between the subjectmat-

ter of the publication, could be discovered, would not be considered an answer.

The publication of a libel by the plaintiff against the defendant *three days* previous to the publication of the defendant's libel against the plaintiff, will not be received in evidence in palliation of the offence on the ground of *provocation.*

It is not allowable to ask a witness *how he understood the libel.* Had the question been *how others understood it,* or *how it was generally understood, it seems* it would have been proper.

NEW-YORK,
May, 1830.

Beardsley
v.
Maynard.

THIS was an action for a *libel,* tried at the Onedia circuit in October, 1828, before the Hon. NATHAN WILLIAMS, one of the circuit judges.

The declaration, after stating by way of inducement, that at the time of the publication of the alleged libel, the plaintiff was attorney of the United States for the northern district of New-York, and bound to render accounts with respect to the monied transactions of his office to the department of the treasury of the U. S.; that during the time that he had held such office, William H. Crawford had been secretary of the treasury of the U. S. and at the head of that department, which he left on the 4th March, 1825, when John Quincy Adams became president of the U. S.; and that the intent of the defendant was to cause it to be suspected and believed that the plaintiff had been guilty of fraud, dishonesty and peculation in his office of U. S. attorney in rendering false and dishonest accounts in respect to the monied transactions of his office, and particularly in making a charge of $600, as expended by him, when in fact he had paid out only $92 ; set forth the libel as published on 20th June, 1828, prefacing that it was in the form of a letter without the signature of any person subscribed or affixed thereto, purporting to be dated 7th June, 1828, and intended to be understood as written by the plaintiff, and addressed to a brother-in-law of the plaintiff commencing with the words " Dear friend and brother Jay," and concluding " your friend and affectionate brother," and containing *inter alia* the following words : " But as I said to you, those I now want to get rid of, laugh at me for a great many things, but particularly because I would not go to the Herkimer convention two years ago when I was appointed a delegate. The truth was, I had reasons which

every body did not know. I knew not who would be nominated whether a friend or foe of Mr. Adams. V. B. (meaning some person designated in said libel by the letters V. B.) had not informed me. My interest required me to stand well with Mr. Adams. My commission was then soon to expire, and you know what a dreadful thing it would have been for me to have been turned out just then when I had so much involved myself. I feared that if I did not keep in with Mr. Adams, my accounts at· the treasury department would be examined, as Mr. Crawford had gone out of office. I had heard that it was whispered, that I had charged the department about $600 for witnesses fees, in certain cases when I had paid but $92, and if I was found opposing Mr. Adams, and any thing inexplicable should be discovered in my accounts, I viewed it a matter of entire certainty, that I should lose my office. Knowing that I was in such a 'picklish' condition, and not knowing whose hands I might fall into, and consequently not knowing what to do, I submit to you whether I did not act the prudent part to do nothing. I have now unbosomed myself to you without reserve." This libel was spread out in *five* distinct counts ; each count containing a portion of it, with the usual inuendoes and averments.

The defendant pleaded the general issue and gave notice, that on the trial of the cause he would prove that for a long time previous to the publication of the supposed libel, to wit, for the space of three months, there had been a *paper war* between the parties, commenced by the plaintiff, and that the publication complained of as libellous was part of an article in answer to an article written by the plaintiff, and published in a newspaper called the *Oneida Observer* on the 17th July, 1828, and that the publication of the alleged libel was provoked by the plaintiff: and further that he would prove that in the making up the bills of costs in five suits prosecuted by the plaintiff as the attorney of the U. S. for the northern district of N. Y., he unlawfully charged for witnesses fees and for subpœnaing them to a large amount, to wit, $884,75, when only $216,20 ought to have been charged.

The libel was published on the 20th day of June, 1828, in a paper printed at Utica called the *Utica Sentinel and Ga-* *zette,* the defendant was shewn to be the author, and its ap- plication to the plaintiff was proved. The whole article was read, though only such parts of it were relied on to support of the action as were set forth in the declaration; it was in these words: "FRIENDLY CORRESPONDENCE. Mr. Ed- itor, The following letter was found in the streets of Rome the morning after a certain meeting was held there last week, and after being freely circulated among the attendants upon the court, was delivered over to me for preservation. It being in a well known hand, I have no doubt of its authen- ticity, but not wishing to have the writer known, I send you a copy. X. V. "Utica, June 7, 1828. Dear friend and broth- er Jay. The court of common pleas sits at Rome next week, and something must be done for the republican party. We are going to ruin unless something be done. By republican party I mean not republican, but Jackson party. I have thought much upon the matter and am satisfied we can never get along, unless we divide the party. Many, I know, would oppose this if they knew the object, but it must be done. And it must all be done under pretence that it is for the benefit of "the party." There is something paradoxical, I confess, in this, but when amputation is necessary, physi- cians always tell us it is for the benefit of the patient. You know I studied medicine once, and I do not see why the same principles will not hold good in politics as well as medicine or surgery. We have many members in our own party in this county that must be cut off. They are for Adams, and adhere to him because he is the republican candidate. They keep constantly repeating what we said four years ago about Jackson being a "federalist," and desiring the "destruction of the republican party," and about his being "unfit" and at an "immeasurable distance from the presidency," and a great deal more such stuff, which it is very unpleasant to hear. Be- sides, they laugh at me and ridicule me, and sneer at the manner in which I got my office, so that the children point their fingers at me and say, there goes a mean man who play-

NEW-YORK, ed foully to get an office, and then turned traitor to those
May, 1830. who gave it him.   They jeer me also about my being whip-
Beardsley ped in by V. B. last August term.   They say he got me into
v. a room and lathered me until I was ashamed of myself.  Now
Maynard. that is too true to make a joke of, but I don't like to be twit-
ted of it.   These things are insufferable, and these offending
members must be cut off; and for that purpose we must get
rid of our corresponding committee.   That consists of May-
nard, ————, ————, ————, ————, ———— and
————.   The three first are for Adams, and ———— can-
not be trusted.   He was for Jackson at the last election,
when I was not, and it hurts my feelings to hear him say he
was always for Jackson, because it reminds me of my own
treachery.   Besides, he agrees with Maynard in saying the
republican party must be kept together, which will not do ;
and he unites with all the Adams men in supporting ————
for sheriff, which is not to be endured.   So we must get rid
of them.   I have thought much how to do it, and have finally
hit upon the following plan : You must, under some pretence,
get Judge R. to come to Rome the first day of the court.
And H. must subpœna ———— as a witness; his brother
has a suit to be tried and that will answer as an excuse.
Father must write to Judge G. that he is unable to attend
court, and he must come out the first day.   Whatever is done
must be done the first day, for the salvation of the republi-
can party, and what is vastly dearer to me, my office, could
not keep Judge G. there more than one day.   Judge R.
and ———— must know nothing of the plan, because they
are honest, and if they knew it, would sooner be quartered
than assist in carrying it into effect.   But we want their
names and must have them to gull others with.   Then we
must have a sly meeting after dark, in Dr. ————'s shop.
We shall get in some half dozen or dozen who shall know
nothing of the object, and appoint a large committee of persons
who are not there, and be careful not to publish the place
where we meet, and then it will go off as the doings of the
republican party.   The simpletons wont know that the ob-
ject is to get rid of the commitee and divide the party.   Then

we will make some of the committee call a Jackson meeting under the name of republican, and the trick will succeed. We must act now, for ——— is absent and has no suspicion of the design, and if we postpone it until he returns he will oppose us, for he, too, is for keeping the party together, and is always for making friends. I act upon a totally different principle. When I find a man is disposed to come among us, I insult him and turn him away. And when I find the party too strong, I take measures to cut off a portion of them. There is a secret in this, but the reason is plain when you understand it. My influence decreases in proportion as the party increases, and I had rather sacrifice my party than loose my influence. The truth is, I never want to see our party in this county a majority, because if it should become so, I shall certainly loose all my control of it. But if my plan succeeds, we shall cut off half or two thirds of the party, and then I can manage the rest. But as I said to you, those I now want to get rid of laugh at me for a great many things, but particularly because I would not go to the Herkimer convention two years ago when I was appointed a delegate. The truth was, I had reasons which every body did not know; I knew not who would be nominated, whether a friend or foe of Mr. Adams. V. B. had not informed me. My interest required me to stand well with Mr. Adams; my commission was then soon to expire, and you know what a dreadful thing it would have been for me to have been turned out just then when I had so much involved myself. I feared that if I did not keep in with Mr. Adams, my accounts at the treasury department would be examined, as Mr. Crawford had gone out of office. I had heard that it was whispered that I had charged the department about $600 for witnesses fees in certain causes, when I had paid but $92. And if I was found opposing Mr. Adams, and any thing inexplicable should be discovered in my accounts, I viewed it a matter of *entire* certainty that I should loose my office. Knowing that I was in such a " picklish" condition, and not knowing whose hands I might fall into, and consequently not knowing what to do, I submit to you

NEW-YORK,
May, 1830.

Beardsley
v.
Maynard.

whether I did not act the prudent part to do nothing. I have now unbosomed myself to you without reserve. I have in fact drawn a full length portrait of myself, and am conscious I could not commit it to more affectionate hands. My political creed you now know fully, and it may be expressed in few words : I would sacrifice my country to benefit my party, and I would sacrifice my party to benefit myself. That's all. Your friend and affectionate brother, ————."

The plaintiff rested.

The defendant then offered in evidence three articles published in the *Oneida Observer* on the 11th March, the 18th March, and the 17th June, 1828 ; the two first over the signature of " Old Schools," and the last purporting to be a letter directed to a colonel ————, of Trenton, and offered to prove that the plaintiff was the author of them ; that it was generally understood that they were pointed at the defendant, and that the publication complained of by the plaintiff was caused by and was written in consequence of, and in answer to, the pretended letter to Colonel ————, of Trenton, which it was also generally understood in the community was written by the plaintiff. The presiding judge, after an examination of the articles offered to be proved, decided that they had no relation to the subject matter of the publication complained of by the plaintiff, and therefore he would not permit them to be proved. The defendant excepted.

The following were the publications offered in evidence and excluded by the judge :

" *To the editors of the Oneida Observer.* Small men are moved by small causes. Hope, fear, anger or good will are alternately excited in such men by the most trifling and transient inducements. Here, in this goodly village, these truths have been strikingly and I may add strangely illustrated within the last few days. Great joy and gratulation, much mirth and low grimace have been exhibited, and all this, forsooth, because Mr. Savage was not chosen supervisor of New-Hartford at the annual meeting last week. And who, pray, is Mr. Savage, that his defeat should be a

source of such uncommon joy in a neighboring town ? I will tell you. He is of the middle age of life ; a practical farmer ; possessed of but a moderate yet comfortable share of property : leading a life of industry, and moreover is an honest man. Such is Mr. Savage as a citizen. He takes rank with the yeomanry of our country, that most honorable and patriotic class of our fellow citizens ; he and they are equals. As a politician, he is, as he ever has been, a member of the democratic family. True at all times to his country and his friends, he has never given countenance to the enemies of the former or deceived the latter. Chosen to the state legislature by his fellow citizens at the late election ; respecting the feelings and wishes of the democracy of this country, harmonizing as they do with the democracy of the state and with his own views, he is found united with the great republican party of the union in favor of General Jackson, and of course in hostility to most of those were speaking and writing treason during the late war. And who are those who now cluckle and laugh at his defeat ? Men of this stamp : I have them in mine eye ; men who held county meetings and denounced that war as " wicked and unnecessary ;" who vilified its supporters, rejoicing at ours disasters and mourning at our successes. Let them hold up the their heads and speak if these things are not so. These, these, and the young sprigs who have shot up from such traitorous roots, now vent their joy at the defeat of Mr. Savage. I congratulate him on having achieved the hostility of such men ; their professed friendship would be dangerous : from their enmity he has nothing to fear. Your neighbour of the Sentinel and Gazette, frivolity personified, is too small game to admit of much notice. He speaks of the defeat of Mr. Savage as " a broad hint ;" a hint, I suppose, to other good federal towns to keep out the democrats. All this is fair, and no fault is to be found with it. When they have the power they have usually exercised it, and would undoubtedly continue to do so without this " hint." Let them not complain that the " doctrine of reprisals " should govern in such cases. But this change of supervisor in one town is to work wonders. It augurs a state revolution ; nay more, it augurs the defeat of General Jackson

NEW-YORK,
May, 1830.

Beardsley
v.
Maynard

NEW-YORK,
May 1830.

Beardsley
v.
Maynard.

This matter is now taken to be settled. Because New-Hartford, being a very decided federal town, has thought proper to elect a federal supervisor, Gen. Jackson will necessarily be defeated. Such is the fact and such the logic. I give great joy to those who can derive consolation from this shadow of a hope. The correspondent who has set out to prove in your paper that Gen. Jackson is not the candidate of the republican party is in unusual favor with himself at this " sign from New-Hartford !" And pray who is that correspondent ? If I mistake not, the columns of the paper he edited during the late war can answer ; a paper more ripe with treason, and which tended more to imbue this community with low bred treachery than all the others papers which have ever been published in this county. Having alternately professed to act with, and as often cheated every party in the state, with what grace can he pretend to call himself a republican ? I have heard it remarked of this individual that he never embarked in no more than one political measure from principle, and that was opposition to the late war. In that he was conscientious, and I give all credit for this distinguished as it was the sole instance of political sincerity. For four or five years past, he claims to have acted with the republicans of this county ; and how acted with them ? Just so far as to be able to deceive them whenever an opportunity presented. Thank fortune the mask is now thrown off, he has returned to his first love. If his old associates, men whom he has reproached and abused, if they will take him, we wish them much joy of a hard bargain. There may he remain. If he and associates " feel to give thanks for the very small mercy" vouchsafed from New-Hartford, the democracy has reason for great joy that he has turned his back upon them, as he did upon his country in her hour of peril. (Signed) *Old School.*

*To the editors of the Oneida Observer.* There are gradations in vice as well as in virtue. Offences committed in the heat of passion, and under strong provocation, although not strictly justifiable, are yet universally regarded with somewhat of indulgence, as not evincing a mali-

cious, wanton or base spirit. But the lower grade of vices, prevarication, duplicity and treachery, the tricks of the mean and the grovelling, no decent man will look upon with composure, or regard otherwise than with the most sincere and unaffected contempt. Offences of this description have no redeeming properties in their composition, they are pure unalloyed baseness. It may be a prejudice, but for myself, I cannot see why treachery in politics is not as contemptible as in any other of the concerns of life. From '98 to this time, this state has presented an encouraging spectacle to the friends of free government. At that period, the advocates for democratic principles arose under the auspices of George Clinton, and united in their exertions for the common good; and from that day to this, they have stood together like a band of brothers, undaunted by opposition and undismayed by occasional defeats. They were devoted to our free system of government and like men of real principle they have adhered to that system with firmness and consistency. For these men, the restrictive system had no terrors, its privations were cheerfully endured; war had no terrors, they met its sufferings and dangers with courage and fortitude; treachery had no terrors; it still has none—often as that honest party has been abused and deceived by its professed friends and supporters. The present posture of the democracy of this state, and its general movements in favor of " Old Hickory," are too plain to be questioned. There are exceptions, it is true, but they are few and far between. The people have willed his election, and in his recent nomination, the representatives have but expressed the wishes of their constituents. The result is with them, they will see that what has been thus solemnly decreed shall not fall through at last. This party has at all times met with opposition. In peace, in war, in all its movements, it has found an organized body of opponents; a party pitted against it. From frank, open and temperate opposition nothing is to be feared. In such conflicts reason is left free to combat error, and is generally successful. It is from false friends, and not from open enemies, that danger is to be apprehended. The

democracy of this state has not only been deceived by false friends, but they have trifled with its good nature, and insulted its confidence. We all recollect the "high minded gentlemen" who broke into our ranks a few years since. I would not bestow indiscriminate censure upon this class of politicians, it doubtless contained some individuals of genuine worth and patriotism. I have known several of that description. But we have in this county some four or five of that stamp, who seem to have been formed for mischief, although an insatiate appetite for office would lead us to regard that as the rulling passion. These men were loud in their professions of respect and veneration for the republican party, the sin of federalism, as they called it, was abjured ; the war which they had opposed, admitted to be just and necessary ; old connexions renounced ; old friends ridiculed and abused without measure, and all this to steal into the confidence of the democrats. These men wanted office, and they were not entirely unsuccessful. From the moment of their entry into the republican camp, like the horse-leech in the fable, they cried "give—give ;" and because every thing was not given, they have turned on their heels and marched out as unceremoniously as they marched in. Look around this county and single out these individuals. Call to mind their incessant and disgusting professions of respect for the democratic party, the bitter and vindictive reproaches which they heaped upon their old friends ; see where they stand, openly arrayed against you ; and ask if their professed republicanism was not sheer hypocrisy, and their vaunted respect for democratic men and measures any thing more than a grovelling appetite for office. Your late nameless correspondent is one of these precious politicians. He is conscientiously opposed to caucuses, and his delicate feelings revolt at the idea of supporting Gen. Jackson. Poor man ! His case, I trust, is not hopeless. It is probably only a new attack of the same malady which afflicted him during the late war. He is now engaged in the project of getting up a federal state convention, for the nomination of presidential electors. Not that he would have it federal in form, although he knows it

will in reality be so. This convention, is to be called by individuals in the several counties,* and attempts are now making to enlist ten persons in this county, who will consent to have their names used for that purpose. The individual alluded to had the impudence, a few days since, to attempt to obtain for this purpose the names of two venerable republicans in the northern part of the county. Similar attempts have been made in other quarters, and indignantly repelled. Republicans are not thus to be drawn in to serve the purposes of their enemies; to be used merely to get up a convention, that their opponents may gather the fruits of such folly. If the four or five individuals above alluded to choose to sign for this county, there can be no objection; they have at all times claimed to be leaders, let them file off and see who will follow. They may however rest assured that other troops than democrats must be enlisted for this expedition. *Old School.*

*Messrs. Editors*—I send you a letter from a gentleman in Utica, to his friend in Trenton. It was delivered in as a credential by one of the delegates to the state convention on the 10th instant, and after procuring the admission of two of the delegates, was thrown by amongst other rubbish of that body as useless. Your's, &c. ————

(*Copy.*) Utica, June 6th, 1828. *Dear Colonel*—I write to you not more in sorrow than in anger. We have been much disappointed if not deceived; to you, a fellow sufferer, I need hardly add, we have been sharply abused. It is painful to inform you that ———— and ———— refuse to go to Albany as our delegates; they talk of consistency, char-

* The following paragraph was printed by way of note : " The Albany Daily Advertiser, that old and incorrigible federal paper, states that an address recommending a state convention, will be issued ere long, and that it will be signed by men in various parts of the state, who have always been distinguished for their active and efficient support of democratic principles. This is the convention which our gentleman is engaged in getting up. Such a republican convention as will serve the purposes of the Albany Daily Advertiser and its patrons."

NEW-YORK, May, 1830.

Beardsley v. Maynard,

acter, political integrity, and other such unmeaning slang. This is all unintelligible to me, as I doubt not it must be to you. I therefore will not attempt to explain what they would be at. It is enough, and too much for us, that they refuse to stand the hand; men who keep dark and stick at character or consistency will never answer our purposes. Thus we are situated, and some two of our party must go to Albany and supply these vacancies in our delegation. Judge ——— and myself held a meeting yesterday, and it was resolved that you and our friend ——— should be detailed for that service. The matter was all talked over, and it was agreed that no uniform federalist would answer in this case; we must have men who have at least professed to be democrats. In the first place, it would be unpopular to select those who have been uniform and consistent in their politics; such men are not up to the times. In the next place, we must take care that our peculiar interest is kept on the lead. We have now a fair chance to put ourselves at the head of the federal party, and the opportunity should not be lost. " Always strike when the iron is hot." I said we had been abused. You know the bucktails are open-mouthed against us—call us traitors—high-minded turn-coats and other such vile epithets. They say we are but a handful of individuals; the Observer lately asserted we could not muster more than four or five of our own kidney in the county. This calling names proves nothing; we are more numerous than has been supposed. That you may see the whole ground, I will give you names, or what shall answer as well, numbers: In Whitestown we are two, Verona one, Floyd one, Trenton one, and in this town, counting our friend from Paris Hill who has recently come here, we are three. This number of good fellows of like faith and united in one object can do much; at all events, it is certain we can loose nothing in the enterprise. Do therefore not fail to be at Albany; this letter will serve you as your credential at Albany. You will have no difficulty in getting admitted to a seat as a member. As we make common cause in this business, the firm will of course expect to pay the expenses. I am

NEW-YORK,
May, 1830.

Beardsley
v.
Maynard.

entirely in favour of this course in all our money matters, for I recently advanced thirty dollars to get a new press established at Rome, but which fell through, and my money is gone. We have, however, got another person started, and that paper will soon be out. This thirty dollars I have charged to our concern; I should bring an action to recover it back; but after examining the law, I am fearful that the principle which renders an immoral contract void would defeat me.

N. B. Take care and not have this letter lost, it might hurt our firm. And believe me, you friend. ——————.

*Col. —— of Trenton.*"

A witness was then called and sworn on the part of the defendant, who testified that he read the articles containing the supposed libel at the time of its first appearance. He was then asked *how he understood it.* This question was objected to by the counsel for the plaintiff and overruled by the judge; to which decision the defendant also excepted. The defendant then went into proof in relation to the bills of costs referred to in the notice attached to his plea, and wholly failed in establishing the charge insinuated in the libel. The jury found a verdict for the plaintiff for $446; which was now moved to be set aside.

*J. A. Spencer,* for the defendant. The evidence of the defendant was offered in mitigation of damages and not in justification, and therefore ought to have been received. In the case of *Finnerty* v. *Tipper,* (2 Campb. 72,) Sir James Mansfield held that evidence of this kind did not amount to an absolute defence in law, but was most essential with respect to the damages; adding, " if two men are concerned in publishing monstrous libels against each other every day, there can be no claim to damages (probably meaning exemplary damages) on either sides. The same principle was fully laid down by this court in *Hotchkiss* v. *Lathrop,* (1 Johns. R. 285,) where a previous publication by the plaintiff was admitted in mitigation of damages and as explanatory of the subject matter, occasion and intent of the defendant's publication.

Whether the publication complained of was provoked, and an answer to previous publications, was matter of evidence upon which the jury had a right to pass; that it was an answer, the defendant contends, is obvious from a perusal of the publications; but if not so, the manner in which it was understood by the community to whom the parties and the peculiar circumstances were known ought to have been allowed to be shewn. In the case of *Southwick* v. *Stevens*, (10 Johns. R. 443,) evidence of previous publications by the plaintiff were received. All the circumstances, the manner, the occasion and the matter of the publication are material and important considerations. (2 Phil. Ev. 106.) It is not to be endured that he who libels others shall recover as heavy damages as one who has given no provocation.

It is admitted that in *May* v. *Brown*, (3 Barn. & Cres. 113,) it was held that in an action for a libel the defendant cannot, either in bar of the action or in mitigation of damages, give in evidence other libels published of him by the plaintiff; but the opinion of the court in that case is expressly put upon the ground that the libels offered to be proved did not relate to the *same subject* as that on which the action was brought; that there was no connection between the publications, and that it was not contended that any one of the libels alleged to have been published by the plaintiff could be said to be the provocation to the particular libel of which the plaintiff complained. Not so here, where it was offered to be proved that the publication of the defendant was *in answer* to the publications of the plaintiff.

To mitigate damages in actions of assault and battery on the ground of provocation, it is conceded that the act must be immediate upon the provocation, or the excuse will not be listened to. In actions for libels, this rule does not govern: longer time is given to answer; and if the publication is made within such time as the party may be supposed to continue under the smart of the injury, it will be considered as an answer and not as a new and unprovoked attack.

A previous publication ought to be admitted in evidence in mitigation of damages, or the consequence may be that one party may obtain a beneficial judgment, whilst the other will

have but a naked verdict, although each may receive the censure of a jury by a verdict against him.

The witness should have been allowed to testify *how he understood the publication.* (2 Wendell, 534.) it depends upon the acceptation in which the public receive a publication of this kind which gives a character to the act ; that is, whether it be viewed as an ironical retort to a previous publication, or as a grave charge affecting the moral character of the plaintiff.

*H. Denio,* for the plaintiff. Had the publication complained of in this case been no more than a biting sarcasm of a political opponent, in answer to a publication of a similar character of the plaintiff, this court most probably would not have been called upon by the plaintiff for their judgment in the matter ; but it is an attack upon the moral purity and the official integrity of the plaintiff, and duty to himself required that by a suit brought against the defendant his reputation might be vindicated from the charges made.

The evidence of the understanding of the witness as to the import of the publication was inadmissible, even if the *general issue* only be considered as pleaded by the defendant. It was intended thus to shew the general understanding of the community as to the import of the publication ; that it referred to or was in answer to a publication on the part of the plaintiff. The libel itself does not refer to any former publication, and no one could so understand it. But the rule is well settled that a witness cannot testify to the purport of a written article. (*Van Vechten* v. *Hopkins,* 5 Johns. R. 311.) Facts cannot be proved by general opinion, except upon questions of general character or something of that nature.

The former publications were not admissible in evidence on the ground of provocation. In the case of personal abuse, the natural passions of men are regarded, and acts, the result of sudden excitement, are looked upon with a charitable eye ; but this charity is not extended to the excuse or palliation of a libeller. In *Lee* v. *Woolsey,* (19 Johns. R. 319,) a libel published by the plaintiff, and slanders deeply affecting the reputation of the defendant, and which never

came to the knowledge of the defendant until the evening before the affray, were held inadmissible in mitigation of damages, the court holding that the provocation must be so recent as to induce a fair presumption that the violence done was committed during a continuance of the feelings and passions excited by it. In *Hotchkiss* v. *Lathrop* the libel alluded to the former publication, and the latter was received in evidence to the correct understanding of the former. So in *Southwick* v. *Stevens*, the defendant read and had a right to read the publications which were the foundation of his strictures. In *Finnerty* v. *Tipper*, and in *Anthony Parquin's case*, referred to by Gould, arguendo, in *Hotchkiss* v. *Lathrop*, the evidence was, that the plaintiff was a *common libeller;* and on that ground it was admitted, and not because the plaintiff had libelled the defendant. It was not attempted here to be shewn that the plaintiff was a common libeller. Besides, the publications offered to be proved by the defendant did not relate to the same subject as that on which the action is brought, which is the *moral* and *official* character of the plaintiff. The publications offered in evidence related solely to the *political* character of the defendant. The reasoning and decision of the king's bench in *May* v. *Brown* is conclusive upon this question.

But if otherwise allowable, under the state of the pleadings the defendant was not entitled to give in evidence the facts he offered in *mitigation*, having failed to establish a *justification*. Though a formal plea of justification was not interposed, the *notice* attached to the plea set up a series of acts shewing improper and illegal conduct on the part of the plaintiff in his official character, which the defendant attempted but failed to prove. The case therefore comes within the decision in *Root* v. *King*, (7 Cowen, 613,) that facts attempted unsuccessfully to be shewn in justification cannot be received in mitigation.

*G. C. Bronson*, (attorney general,) on the same side. The decision in *Van Vechten* v. *Hopkins* is a complete answer to the offer to prove by a witness *how he understood* the publication. It is inadmissible to shew the opinion of one or more

witnesses as to the import of a publication. Had the witness testified that he did not consider it a libel, it would have amounted to nothing. It is only where the jury cannot judge from the evidence before them, that the opinions of witnesses are received to aid them in coming to a correct conclusion, as where skill or science is required to shew the true situation of things.

The matters set up in defence in the notice, though not amounting to a justification, being put forth as such, the defendant must abide by the attitude he assumed; they were not set up in mitigation. If relied on in mitigation, they should so have been stated; and, not being so stated, they must be considered as put on the record in justification.

The former publications were not admissible on the ground of provocation. The doctrine of the case of *Lee* v. *Woolsey* fully applies here. The cases of *Pasquin*, and *Finnerty* v. *Tipper*, have been overruled in *May* v. *Brown*. Former publications are admissible in evidence only when they are a part of a series of pieces between the *same parties* and relate to the *same subject matter*. A charge of moral turpitude and official misconduct cannot be considered a continuation of a controversy between political partizans, in which one had charged the other with political tergiversation. The attorney general also cited 8 *Mass. R.* 248 ; 6 *Munford's R.* 465 ; and *Saunders on Pl. & Ev.* 813.

In actions for *torts*, what occurs at the time and on the occasion may be given in evidence, but nothing beyond. Was it allowable to go into the consideration of previous *torts* between the same parties, various and distinct matters would be presented to the inquiry of the jury, and their attention would be diverted from the points in issue. Besides, the defence is in the nature of a set off of one tort against another; and, if allowed, would be no bar to an action subsequently brought by the defendant against the plaintiff.

*H. R. Stores*, in reply. In *Hotchkiss* v. *Lathrop* the defendant was allowed to shew a previous publication; and what was said by judge Spencer in delivering the opinion of the court in that case is directly in point. " It was," says

he, "matter properly admitted in evidence, that the plaintiff had written a piece to which the defendant's was *an answer*." There a third person (for the first publication did not relate to the defendant) was permitted to avail himself of such evidence ; here it was denied to the party himself. It is because the plaintiff is a common libeller ; it is on the ground of the demerit of the plaintiff that the evidence is admissible. *Answer*, as used by the judge, does not mean refutation, but reply ; and the inquiry for the jury is whether the libel was occasioned by the previous publication. If considered on the ground of provocation, it cannot be said that the publication was so long after the appearance of the plaintiff's libels, that it should be considered as a new attack, and not as an answer. Besides, the continued circulation of the previous piece may be considered as a new publication, at the very time of the coming out of the alleged libel.

In the case of *May* v. *Brown*, Ch. J. Abbott refused to receive evidence of particular libels published of the defendant by the plaintiff, but he did receive general evidence that before the publication of the libel complained of, the plaintiff had published other libels of the defendant. This proposition should be reversed. Provocation, according to this rule, may be shewn in mitigation, and yet it is not a set off. The evidence is admitted to shew that the plaintiff has himself invited the attack he complains of, and been the author of his own sufferings.

It is said there is a vast distinction as to the nature of the publications in question ; that those of the plaintiff charge the defendant only with political tergiversations, whilst that of the defendant impeaches the moral character and the official integrity of the plaintiff. The counsel said he did not so read the publications ; he knew not how a man could be represented as politically destitute of honor, honesty and integrity, and yet that his private character for morality should be considered unassailed. Such might be a code of morals for libellers, but it was for no one else.

If the defendant could shew that the plaintiff had succeeded in scandalizing him, he had a right to shew it when that same plaintiff sought to recover damages for libelling him,

and that whether the provocation to the libel was immediate or not; for in whose favor, on the score of morals, is a verdict to be rendered? It is a mockery to say that a libeller is entitled to exemplary damages.

*By the Court*, MARCY, J. The motion for a new trial in this case is placed on two grounds: *First*, The exclusion of the evidence offered by the defendant to shew that the plaintiff was the author of three articles reflecting on the defendant, published, two of them in March and the other in June, the last a few days previous to the publication of the libel; *Second*, The exclusion of the testimony of a witness called on to state how he understood the libel.

It is contended that the previous publications should have been received because they were a provocation to the act complained of by the plaintiff; and also because the supposed libel was a reply to them, or at least to the last of them.

The benignity of our laws respects, to a certain extent, the frailty of our nature. A just provocation is allowed in some cases to palliate offences, where the offence or wrongful act is done under the immediate excitement of the provocation before time for reflection has been afforded. *Ira furor brevis est;* short however as it is, the policy of the law is to restrain its natural operation. A few moments is all the toleration that can be given to it. In the present case not only hours, but days passed between the last publication attributed to the plaintiff, now set up as a provocation, and the publication of the libel. There was most abundant time for the passions to cool, and for the defendant to recollect that redress could be rightfully attained only by an appeal to the laws of the country, and not by any act of retaliation. To allow the defendant to avail himself of articles written by the plaintiff and published some of them months, and the last several days before the issuing of the libel, would be more than respecting human frailty; it would be indulging it to a pernicious length. No man under the protection of the law is to be the avenger of his own wrongs. He is bound to appeal to it for redress; it is on this subjugation of the natural passions to the general *good* that society itself depends. (2 Chit. C. L. 405.)

We were urged on the argument to make a distinction between a provocation by words and one by a newspaper publication, because the latter, it was said, was in effect reiterated every time it fell under the defendant's eyes. If such a distinction could be admitted in any case, of which I have great doubts, there is nothing shewn which calls upon us to allow it here. There was time enough for passion to subside and for reason to operate, and the defendant might have employed the time which was devoted to the composition of the libel in considering that it did not belong to him to redress his own wrongs in his own way.

The decisions of this court do not leave us without authority on this subject. In the case of *Lee* v. *Woolsey*, (19 Johns. R. 219,) the defendant offered to prove circumstances much more provoking, and some of them more recent, than those which were offered on the trial of this cause. There was not only a libel published a few days before the assault on the plaintiff, but scandalous insinuations the very evening before. These were not only the cause of the personal violence, but they were the subject of the conversation between the parties immediately preceding it, and yet they were considered as constituting no legal provocation that the defendant could avail himself of on the trial, to extenuate his conduct or reduce the plaintiff's claim for damages. " It appears to me," said *Spencer*, J. who gave the opinion of the court in that case, " neither to comport with sound policy nor law to allow an inquiry into antecedent facts in such a case as this, unless they are fairly to be considered a part of one and the same transaction."

But it is said that the article complained of as a libel was a reply to the previous publications written by the plaintiff. If such was the fact, the judge erred in not submitting them along with the libel to the jury. When an answer, that is truly such, in point of fact, is complained of as libellous, it is obvious to reason that the piece answered as well as the answer should be laid before the jury. In most cases the correct understanding of the latter would depend upon knowing the former. Upon this principle the case of *Hotchkiss* v. *Lathrop*, (1 Johns. R. 286,) was decided. It was supposed

that the former publication was explanatory of the subject
matter, occasion and intent of the latter, and a knowledge of
it was required to make the libel intelligible. The rule that
was applied to that case does not apply here, because the
reasons for the rule are not found in this case. The publi-
cation in which the libel is found does not profess to be,
and is not, in point of fact, an answer to any of the articles
imputed to the plaintiff, and by submitting them to the jury
no such objects could be obtained as was proposed in the
case of *Hotchkiss* v. *Lathrop*, by laying before the jury the
publication to which the alleged libel was in truth an answer.
In this case neither of the publications offered by the defend-
ant was in any respect a reply to the alleged libel; neither
of them related to the subject matter of it; neither of them
contained any thing explanatory of its intent or requisite to
a perfect understanding of it.

I cannot adopt the idea that to retort crimination is an an-
swer. There must be some relation, some perceptible con-
nection between the subject matter of the publications to
warrant the application of the principle of the case of *Hotch-
kiss* v. *Lathrop*; but no such connection has been discover-
ed by an attentive perusal of the pieces offered in evidence
by the defendant in this case.

It is further urged, that if the publications had no relation
whatever to the libel, they should have been received and
laid before the jury to mitigate the damages. This position
is sustained principally by the authority of the case of *Fin-
nerty* v. *Tipper*, (2 Campb. 72,) and what is said in *Tobart*
v. *Tipper*, (1 Campb. 350,) about Lord Kenyon's decision in
Anthony Pasquin's case. These were decisions at *nisi prius;*
the principle on which they proceeded is not very fully ex-
plained, and they are now without any authority in the
courts where the judges sat who pronounced them. Al-
though they were urged upon the consideration of the king's
bench, in the case of *May* v. *Brown*, (4 Dowling & Ryland,
670, 3 Barn. & Cress. 113, S. C.) by such counsel as Cop-
ley, (now lord chancellor of England,) and Brougham, the
court did not regard them, but decided in that case, after the
fullest argument and the most mature deliberation, that oth-

NEW-YORK,
May, 1830.

Beardsley
v.
Maynard.

er libels published by the plaintiff of the defendant not rela-
ting precisely to the same subject matter, could not be con-
sidered either in bar of the action or in mitigation of the
damages.

Upon what principle of law should the publications offered
by the defendant have been received? it cannot be pretended
that *torts* can be set off. It would be unjust that the defend-
ant should be allowed what damages he has suffered by the
plaintiff's libels by way of mitigating the plaintiff's damages
claimed in this suit, and still be at liberty to prosecute the
plaintiff for the same publications and recover for the whole
amount of the injury he has sustained by them; yet I appre-
hend such would be the operation of the principle contended
for on the part of the defendant. If the defendant should
prosecute for the alleged libels contained in the publications
offered in evidence to reduce the amount of the recovery in
this case, the fact that they had been used for that purpose
could not be interposed either in bar to the suits or in mit-
igation of damages.

If these publications were to be used for the purpose for
which they were offered by the defendant, the plaintiff ought
certainly to be permitted to justify; thus the jury, instead of
trying the issue sent down, might be called on to hear the
excuse for, or investigate the truth of, a succession of crim-
inatory and re-criminatory publications which the parties may
have indulged in for years. This is a very supposable case;
indeed it would be very likely to happen if the parties were
the conductors of opposing political journals.

In addition to the case of *May* v. *Brown,* which so direct-
ly supports the decision of the circuit judge, I find a case re-
fered to by Saunders, in his Treatise on Pl. & Ev. 813. It
is the case of *Wakely* v. *Johnson,* reported by Ryan & Moo-
dy which is said to decide that the defendant cannot give in
evidence that the plaintiff was in the habit of libelling him.
In the case of *McAlexander* v. *Harris,* (6 Munford's R. 465,)
the supreme court of appeal of Virginia decided that the
defendant in an action of slander is not permitted to prove,
that before speaking of the slanderous words the plaintiff

was in the habit of vilifying, insulting or provoking him and his family. I am of opinion that the correctness of the judge's decision on this part of the case is sustained by strong reasons and the highest authority.

The other ground on which the motion for a new trial rests is the supposed error of the circuit judge in refusing to hear a witness, offered by the defendant testify, *how he understood the libel.* The argument in support of this branch of the motion seemed to assume that the judge had refused to hear the witness state what was generally understood to be the meaning of the alleged libel. The case does not present such a point. After the witness had stated that he had read the supposed libel, he was asked how *he* understood it. The objecttion was to this question, and the judge refused to hear the answer of the witness. It will be perceived that the witness was not asked *how others understood* the supposed libel ; he was not interrogated as to any extrinsic facts which might show it had an application different from that for which the plaintiff contended. The case of *Van Vechten* v. *Hopkins,* (5 Johns. R. 211,) is an authority too clear and explict on this point to permit a doubt to be entertained. In that case, the plaintiff offered to prove by a witness that from reading the libel he applied it to the plaintiff ; this proof was excluded by the judge at *nisi prius,* and his decision unanimously confirmed by this court. The reason assigned for excluding this testimony was, that it was the mere opinion of a witness, which the court said ought not to have any influence upon the verdict. Opinions are not proofs, and if they are ever received it is in cases involving peculiar or professional skill, and then they are usually accompanied with the facts and reasons on which they are based. It was the duty of the jury to say how the libel was to be understood, after they had heard all the extrinsic facts that the parties chose to submit to them ; and in coming to this conclusion it was not proper that they should have been influenced by the mere opinion of any witness. The asking of a witness to apply the libel, as was done in the case of *Van Vechten* v. *Hopkins,* or to tell how he understood it, as was done in this case, appears to me to be much

the same thing; and if the testimony offered in the one case was properly rejected, that offered in the other could not be received.   I see no reason for granting a new trial.