Gould
v.
Weed.

---

## GOULD vs. WEED.

In an action for a *libel*, the defendant may give in evidence *previous publica-
tions* by the plaintiff, where their admission is necessary to a due under-
standing of the purport and object of the publication alleged to be libellous,
or where their tendency is to give a character to the article alleged to be li-
bellous, by softening its asperity or mitigating its severity; but such pre-
vious publications are not admissible in evidence for the purpose of showing
*provocation*, unless of so *recent* a date as to afford a fair presumption that
the article alleged to be libellous was published under the impulse of passion,
excited by such previous publications; nor are they admissible to prove the
plaintiff a *common libeller*, or that the publication complained of as a libel
was the retort of *severe crimination.*

The plaintiff in such action, where the declaration contains several counts,
may on the trial abandon all the counts except one, and may even restrict
his claim to damages to a *portion* of the matter alleged in that to be libel-
lous; and, in such case, the defendant is not allowed to justify the residue
of the publication.

Where a defendant offers in evidence previous publications by the plaintiff,
and on objection that they are irrelevant and inadmissible, the judge pre-
siding at the trial may in his discretion require that the publications, in-
stead of being read in the hearing of the jury, be submitted to his peru-

NEW-YORK,
May, 1834.

Gould
v.
Weed.

sal, to enable him to determine upon their admissibility; and if the defendant declines to submit to such requisition, the judge may reject the evidence.

A previous publication, if otherwise inadmissible, cannot be read in evidence although printed as a *text* to the publication alleged to be libellous; its juxta-position alone does not entitle the defendant to claim its reading.

THIS was an action for a *libel*, tried at the Albany circuit in September, 1831, before the Hon. JAMES VANDERPOEL, one of the circuit judges.

The declaration contained several counts. The third count stated, by way of inducement, that it was generally reported, suspected and believed, that a conspiracy had been formed by certain wicked and evil disposed persons, being members of the fraternity of *free-masons*, to kidnap one William Morgan, and that pursuant to such conspiracy, Morgan had been kidnapped and carried away by such wicked and evil disposed persons, and had been by them murdered; and also that it was reported, suspected and believed, that some of the persons concerned in such kidnapping had escaped from punishment; that the plaintiff was a member of the fraternity of free-masons; that on the 1st October, 1826, a public meeting was held at Rochester for the purpose of taking measures to detect and bring to justice the persons concerned in kidnapping Morgan, at which meeting divers persons, and among others the *plaintiff*, were appointed a committee, denominated the *Morgan committee*, for the purposes above expressed; that in August, 1829, an inquiry and investigation was had by a grand-jury at Rochester, in the county of Monroe, upon a complaint preferred before such jury against *Edward Doyle* and others for being concerned in kidnapping Morgan; and that, upon such complaint, the *plaintiff* was sworn and examined as a witness of and concerning the subject matter of such complaint. After stating this introductory matter, the plaintiff proceeded in his count to charge that the defendant, well knowing the premises, but contriving, &c. on the 27th October, 1829, wrote and published a libel containing, amongst other things, the false, malicious, defamatory and libellous matter following—that is to say: " *I (meaning the defendant) shall prove that while he (meaning the plaintiff) was acting or*

*pretending to act upon a committee appointed by the good people of Monroe county to investigate the masonic outrage, he furnished money to enable at least one of the kidnappers to escape from justice. I (meaning the defendant) shall then prove that he (meaning the plaintiff) has deliberately and solemnly sworn that he utterly disapproved of the whole outrage, and that he had no agency in it before or after its commission;* and when he shall have been fully exposed to this community as a perfidious man, a profligate libeller, and a shameless hypocrite, he will be left with a bitter and self-upbraiding spirit, to bewail the folly and falsehood that led him to cut and season the rod with which he was scourged." The defendant pleaded the general issue, and attached to his plea a notice of special matter to be given in evidence. On the trial of the cause, the plaintiff produced a stipulation in writing, entered into by the attorney for the respective parties, as to certain admissions of the respective parties, to be given or offered in evidence, subject to all legal exceptions, and from the stipulation read in evidence the following admissions, to wit: that on the 27th October, 1829, the defendant was one of the editors and publishers of a newspaper, printed in the village of Rochester, called the " Antimasonic Enquirer," and published in that paper an article composed by him, in these words : " The controversy between Jacob Gould and myself having assumed a judicial character, further newspaper discussion would seem to have been unnecessary, but as he has thought proper to make a gratuitous attack upon me, I may be permitted to repel it ; and if, in doing so, I should deal plainly with him, I shall be held acquitted by this whole community when they come to know Jacob Gould as I know him. I do not feel called upon at this particular time to go into a discussion of the relative respectability of Mr. Gould and myself, or to inquire whether he or I spend our nights most reputably. But I do promise, if my life is spared long enough to conduct this controversy to a result, to exhibit Gould to the world in an attitude so unequivocally infamous, that every virtuous mind will turn from him with horror and disgust. I have instructed my counsel to join issue with Mr. Gould, and to prepare the cause for trial before the next circuit. My only apprehension is, that he

will cry, craven and shrink from the tribunal to which he has appealed. But if he does, he shall go with a mark upon him, which shall forever attract the eye of contempt and the finger of scorn. For the strict truth of all that I have said about Jacob Gould, I am ready to answer at the bar of public opinion, in a court of justice, and before a still higher tribunal, where (however well falsehood may serve us here) neither of us can hope to conceal the truth. The conversation attributed to Mr.——, I am prepared to prove by impeachable testimony. I learn however that the conversation took place on the 9th of July, and not in June, as was stated in the Enquirer of the 13th inst. Whether Mr. ——'s denial is based upon that quibble or not, I am unable to say. I shall prove that Mr. Gould paid $50 towards defraying the expenses of Mrs. Munro and Cron. *I shall prove that while he was acting (or pretending to act) upon a committee appointed by the people of Monroe county, to investigate the masonic outrage, he furnished money to enable, at least, one of the kidnappers to escape from justice. I shall then prove that he has deliberately and solemnly sworn that he utterly disapproved of the whole outrage, and that he had no agency in it before or after its commission.* All these offences I distinctly charge upon Jacob Gould and am prepared to prove them to the satisfaction of any impartial court and jury. I am acting with a clear and full view of the consequences which must flow from this investigation. I know the issue will fix indelible disgrace upon one of us, and I am ready to abide that issue. Mr. —— is Jacob Gould's successor in the office of grand scribe. His business last summer was to furnish relief to Bruce, Whitney and the family of Col. King. Jacob Gould was appointed grand scribe because he resided at the head quarters of the conspiracy, and was presumed to know how and when the ' ostensible' charities of the institution should be dispensed. Moneys were placed at his disposal. The same duties which Mr. ——, as the present grand scribe, came west to discharge last summer, devolved upon Jacob Gould when he filled the same office. Those duties he did discharge ; and so he reported to the grand chapter at the session in February, 1828. The inquiry of Mr. —— as to the disposition which his predecessor made of the funds was

a perfectly natural one. Jacob Gould will deeply lament the infatuation which prompted him to fasten this quarrel upon me. He knows and confessed that I stated things truly as I heard them. He told me that they came from men who were offended with him, because he refused to pay money for such purposes. But upon reflection, he saw that he must propitiate the fraternity, or exposure and ruin would be inevitable. This could be done in no way so well as by assailing me. There is, however, a point beyond which endurance ceases to be a virtue. Jacob Gould has gone beyond this point, and it is due more to the good and just cause with which I am connected than to myself, to make an example of him; and when he shall have been fully exposed to this community as a perfidious man, a profligate libeller, and a shameless hypocrite, he will be left with a bitter and a self-upbraiding spirit, to bewail the folly and falsehood that led him to cut and season the rod with which he was scourged. THURLOW WEED." He also read an admission that, at a public meeting of the citizens of Monroe county, held on or about the 14th of December, 1826, at Rochester, the plaintiff was present and was appointed a member of the Morgan committee, to detect and bring to justice the persons concerned in the kidnapping of Morgan. The defendant admitted, on the trial, that the papers containing the alleged libel was circulated in the county of Albany, (where the venue was laid and trial had,) and further, that at the time of the publication, it was generally reported and understood that William Morgan had been kidnapped. The counsel for the plaintiff read to the jury the *entire article* published in the Anti-Masonic Enquirer above specified, but previous to reading the same, stated that the plaintiff claimed damages only under the third count of his declaration, and limited his claim for the publication of that portion of the libel which in the above statement is printed in italics ; and then the plaintiff rested his cause.

The counsel for the defendant now offered to read the residue of the stipulation and the matters therein contained: which was objected to by the plaintiff's counsel, on the allegation that the stipulation contained transcripts of various publications by the respective parties, deemed by the plaintiff irrel-

NEW-YORK,
May, 1834.

Gould
.v.
Weed.

evant and inadmissible upon this trial. The judge desired the counsel for the defendant to hand him the stipulation, which he declined to do, insisting upon his right to read the same in open court ; the judge ruled if the paper was not submitted to his inspection, or its contents stated, that it should not be read, and the counsel persisting in his claims, the judge refused to permit the paper to be read. The counsel for the defendant then offered in evidence a publication by the plaintiff in the *Rochester Daily Advertiser*, *after* the 13th and previous to the 27th October, 1829, insisting that the article complained of as libellous, was in answer to, and a comment upon such publication of the plaintiff, which was in these words: " It is at all times disagreeable to be engaged in news paper controversy, but it is more particularly so when we find ourselves compelled, from the force of circumstances, to enter the list with men wanting principle and wanting bread ; men, too, whose days, from their infancy upwards, have been spent in traducing and vilifying the character of their neighbors and benefactors, and whose nights have been occupied in scenes calculated to fill the virtuous mind with horror and disgust. I should not again have troubled the public with any publication of mine, was it not for the continued abuse, at this particular time, of the editors of the Anti-Masonic Enquirer. The statement published in that abusive print, I have already pronounced untrue ; and I am now, in addition, authorized by Mr.———, of Albany, to say that the conversation mentioned in the Enquirer, which is said to have taken place at the Eagle Tavern in June last, in relation to myself, so far as he is concerned, is absolutely false. The statement, also, that I paid fifty dollars, or any other sum, to get Mrs. Munro or any other person from Canada, or the insinuation that I ever paid one cent to aid any one concerned in the abduction of Morgan, to get them clear of punishment, or for any other purpose, is also false. I have commenced a prosecution against the editors of the *Enquirer ;* and here I shall rest, unless some more moral and virtuous person than Thurlow Weed shall see fit to become my accuser. (Signed) Jacob Gould." The admission of this publication in evidence was

objected to by the plaintiff's counsel, and rejected by the judge. The defendant next, with the avowed object of explaining the subject, occasion and intent of the publication alleged to be libellous, offered in evidence another publication of the plaintiff, which appeared in the *Rochester Daily Advertiser*, of the 12th October, 1829, in these words: "To the editors of the Anti-Masonic Enquirer. Gentlemen: In answer to your rumor, of an extraordinary character, published on the 6th instant, I cheerfully explain, so far as regards myself. In February, after the abduction of Morgan, I was elected one of the officers of the *grand chapter*, and, as is usual, particularly in masonic bodies, there were funds appropriated for charity. During the year I held said office, I received one hundred dollars, and expended it in small sums—not *ostensibly*, but really for charity; and it is the only money that ever came into my hands from the chapter, or any other masonic body, during that or any other year. October 12, 1829. (Signed) Jacob Gould." Which evidence thus offered was objected to by the plaintiff, and rejected by the judge. The article by the plaintiff, stated to have been published *after* the 13th day of October, 1829, was placed at the *head* of the publication of the defendant, alleged to be libellous, *by way of text*, and the defendant's publication followed *as a comment*, and upon the ground that the whole formed but one publication, and with the alleged view of informing the jury of the whole matter, and to explain the publication said to be libellous, the defendant's counsel offered to read *the entire publication complained of, with the article of the plaintiff prefixed*, but the plaintiff's counsel objected, and the judge would not permit it to be done. The defendant read in evidence a stipulation of the plaintiff, admitting that one *Burrage Smith* and one John Whitney kidnapped William Morgan, and carried him away from *Canandaigua*, in the county of Ontario, to the county of *Niagara*, in pursuance of a conspiracy in which they were concerned; and proved, that in August, 1829, the plaintiff in this cause was sworn as a witness before a grand jury of Monroe county, on a complaint against Edward Doyle and others, for a conspiracy falsely to imprison and carry away William Morgan to parts unknown; and, upon that occasion, testified

that he was not knowing to the abduction of Morgan until
some time after it took place, and that his knowledge then
was derived from common rumor, and not from information
of any of the persons implicated in the transaction; and, in
the course of his testimony, stated that he had no knowledge
or participation in the offences committed upon Morgan, that
he had uniformly disapproved them, and had counselled
against the adoption of any measures whatever in reference
to the suppression of Morgan's book.  The defendant offered
in evidence a record of conviction of Eli Bruce and three
others charged with the abduction of William Morgan, which
was objected to and rejected.

The defendant proved, by the secretary of the grand royal
arch chapter of the state of New-York, that in February,
1827, a resolution was passed by the chapter that the sum of
$1000 be placed at the disposal of the trustees, to be by them,
in their discretion, applied to charitable purposes.  Previous
to the passage of this resolution, the Morgan abduction had
been discussed, and a resolution had been passed by the grand
chapter disapproving of the Morgan outrage, and disclaiming
all participation in or knowledge respecting it; but the wit-
ness who spoke on this subject could not tell what objects
were entertained in the passing of the resolution, appropria-
ting the $1000.  Nothing was said as to the object of the ap-
propriation and no remarks were made.  One of the officers
of the grand chapter, at the time of the appropriation, tes-
tified that he had never before known an instance of a gene-
ral appropriation, the mode of dispensing charity being to pass
upon individual claims, in detail, after reference to a commit-
tee; and another officer of the chapter testified, that pre-
vious to this time, he had never known of money being placed
in the hands of the trustees for such purposes.  The secreta-
ry of the grand chapter also produced the book of minutes of
the *trustees*, from which it appeared, that on the same day the
appropriation was made by the grand chapter, it was resolved
by the *trustees* that the sum of $300, out of the money appro-
priated as above, be placed in the hands of *Jacob Gould*, for
which he is to account.  Gould attended the meetings of the
chapter in February, 1827, and was then elected grand scribe;

NEW-YORK,   and as such, was one of the trustees *ex officio.* The treasurer
May, 1834.  of the grand chapter at the time, and who continued in office
            until 1830, proved the payment of $300 to Gould personally,
Gould       and the payment of $200 subsequently on his drafts, which
v.          payments were made out of the appropriation of $1000 ; and
Weed.       the treasurer of the chapter appointed in 1830 produced the
            treasurer's book, from which it appeared that the sum of $950
had been paid under the general head *charity,* and testified
that there are vouchers and receipts for all the expenditures
of the chapter except the $950.   It was proved by the officers
of the society that Gould had never accounted for the money
paid to him, and that there was no entry whatever respect-
ing the expenditure of the $1000.   It was proved, that in
1827, a Mr. E. of Albany wrote to a Mr. M. at Rochester to
obtain a draft from Gould for $100 upon the charity fund of
the grand chapter.   M. called upon Gould and informed him
of the request, and he gave M. a draft for $100, which M. sent
to E. ; the letter of E. was not shewn to Gould, nor was any
thing said as to the object for which the money was wanted.
E. was sworn as a witness, and testified, that as an officer
of a lodge, he had occasion for some money for charitable
purposes, and wrote to M. to obtain a draft from Gould for
$100, which he received.   The counsel for the defendant
then offered to prove by this witness that he paid the $100 to
*Burrage Smith,* one of the kidnappers of Morgan, to enable
him to escape from justice ; to which testimony the plaintiff's
counsel objected, unless the defendant first proved that the
plaintiff had some participation or agency in that appropri-
ation for the purpose alleged, or some knowledge respecting it.
The judge decided that the defendant must first prove that
the plaintiff had some agency in, or consented to, or knew of
the alleged appropriation, or payment of the said $100 by
the witness, before the testimony offered could be admitted.
The defendant's counsel insisted, that from the testimony
already given, the jury might infer knowledge, on the part
of Gould, of the object for which the draft was request-
ed, and to which it was to be applied, but the judge ad-
hered to the decision already made, and the defendant's
counsel excepted.   The defendant next offered to prove

the truth of the allegations contained in the publication read by the plaintiff; but the plaintiff objecting to such proof, the judge refused to permit the defendant to prove the truth of any matter contained in the publication, other than what related to that part thereof to which the plaintiff confined his claim to damages. The evidence being closed, the judge charged the jury, who found a verdict for the plaintiff for $400. The defendant having excepted to various decisions made, and obtained a bill of exceptions to be duly signed, moved for a new trial.

*M. T. Reynolds & J. A. Collier*, for the defendant.

*A. Samson & D. D. Barnard*, for the plaintiff.

*By the Court*, NELSON, J. The plaintiff, on the trial, abandoned in open court all the counts in his declaration except the third, and restricted his claim to damages to a distinct portion of the libellous matter alleged in that count. It contained the essence of the whole charge, and severely arraigned the conduct and character of the plaintiff. That the plaintiff had the right thus to limit the subject matter in litigation to a specific point, is beyond question, and indeed was not contested on the argument. 7 Johns. R. 120.

The charge relied on to sustain the action was, in substance, that while the plaintiff was acting or pretending to act upon a committee appointed by the people of Monroe county to investigate the masonic outrage, he furnished money to enable one of the offenders to escape from justice ; and that he had solemnly and deliberately sworn that he disapproved of the whole outrage, and had had no agency in it before or after its commission.

The counsel for the defendant offered to read in evidence a portion of a stipulation in writing between the parties as to admissions to be made on the trial, from which the above publication was read, which was objected to as irrelevant, embracing other publications between the parties on other and different occasions. All the matters admitted by the stipulation were in terms subject to legal exceptions as to their ad-

missibility in evidence. Upon this offer, a question arose on the trial which it may be proper to notice. The counsel insisted upon reading from the stipulation the parts objected to, to enable the judge to understand the question, while the latter requested that the paper should be handed to him, and he would examine it for himself; which was refused. Questions involving the admissibility of evidence belong exclusively to, and are to be considered and decided by the court; and we are unable to discover any well founded reason why the judge should be compelled to hear the counsel read the document objected to, upon this preliminary inquiry, if he chooses to examine it for himself. The only legitimate object of reading it is to put the court in possession of the contents, which is most effectually attained by submitting it to his perusal. Even the adverse counsel is entitled to the inspection of a paper thus offered in evidence, before it can be read, to enable him to object to its admission, if he thinks proper to do so; and it would be strange if the same privilege did not belong to the court when an objection is made to it. There are obvious reasons why the power thus claimed should be possessed, as the practice of offering inadmissible testimony is liable to abuse and is sometimes abused when it rests in parol, with a view improperly to influence the jury. The character of the counsel forbids any such inference in this case. We are satisfied, however, that he erred in refusing to submit the stipulation to the inspection of the judge, and that the judge would have been justified in rejecting it solely upon that ground. But waiving this point, and conceding the stipulation to be before the court, as the counsel proposed to read the whole of the matter embraced in it, if any part was inadmissible, it was properly rejected on the general offer: and as specific parts were proposed to be read subsequently, and which must be met upon the merits, it will be material to examine only the questions thus distinctly raised, as the decision of them will meet both the general and specific offers of the evidence made and rejected.

It is settled in this court, in the case of *Beardsley* v. *Maynard*, 4 Wendell, 336, and in the court for the correction of errors, 7 id. 560, S. C., that the previous publications of a

plaintiff are not admissible in evidence by way of shewing a provocation in palliation of the libel of the defendant, unless they be so recent as to afford a fair presumption that the libel complained of was published under the impulse of passion produced by them, and which the law will regard in consideration of the frailty of our nature. When and under what circumstances the law will or will not permit the administration of justice to be influenced by these considerations in this action, was discussed and settled in that case, so far as any general rule on the subject can be established. It is at least clear that the defendant does not come within, and cannot receive the benefit of it in this case. The doctrine, also, that previous publications were admissible to prove the plaintiff a common libeller, or that the libel complained of was but the retort of crimination, with a view to mitigate the damages, was, in the case of *Beardsley* v. *Maynard*, examined and repudiated. Under evidence of the general bad character of the plaintiff, and which it is competent for the defendant to give, he has the benefit of any particular defects or blemishes in the character of the plaintiff; and the retort of crimination, we have seen, is regarded with indulgence only when founded upon a reasonable provocation. On neither of these grounds was the evidence offered in this case admissible.

There is but one other ground upon which its admissibility can be claimed, that 1 can conceive of, or that has the sanction of any authority of which I am aware, and that is when the previous publication is material to afford explanation, and a right understanding of the purport, meaning and object of the article charged as libellous. Whether such will be its operation and effect, must from necessity always be a question for the court, to be determined upon an examination of the several articles. When admitted, their weight and influence, explanatory of the alleged libel, belong to the jury, under a proper direction, and the effect will be as various as the nature and character of the different publications. In some cases, articles on their face clearly calumnious may, by reference to the previous publications and which are explanatory of them, become harmless or justifiable ; in others, the tone of crimination and vindictiveness will be softened and subdued,

and though not justifiable or excusable, the tendency will be to mitigate the damages claimed. There are many cases in the books, the decision of which are founded upon, or are illustrative of the above view. *Hotchkiss* v. *Lathrop*, 1 Johns. R. 286 ; *Southwick* v. *Stevens*, 10 id. 443 ; *Beardsley* v. *Maynard*, 4 Wendell, 336, in this court ; and *Sir J. Carr* v. *Hood and another*, and *Tobert* v. *Tipper*, 1 Campb. 351, and note. *May* v. *Brown*, 3 Barn. & Cress. 113. *Wakeman* v. *Johnston*, 1 Ry. & Moody's N. P. R. 422. In all these cases in which previous publications were admitted, their tendency was to elucidate and explain the libellous article in question ; and, without them, its scope and design would not have been fully comprehended by the court or jury. The principle and reason of their admission are intelligible and sound, and the practical operation and effect just to all. Every means are thereby afforded to the defendant and all concerned to ascertain the true intent and purpose of the libel, and the innocent or defamatory character, as the case may be, which belongs to it. Beyond the above view, I know of no good or substantial reasons for admitting previous publications in evidence ; and without such the inconvenience and embarrassment in the trial of the cause require their rejection. There can be no great danger of injustice being done to any one ; for if the previous article is a libel upon the defendant, he has the same remedy which the plaintiff is seeking, to vindicate his character, and that too whether it is admitted in evidence or not ; if it is a libel upon another, that of itself is no reason for the defendant's libel, as such third person has his remedy ; and if it is to show that the defendant's libel is but the retort of severe crimination, or that the plaintiff is a common libeller, we have seen in the one case that it is only competent under the principle of law which regards the frailty of our nature, and in the other inadmissible, and available only by evidence of general bad character. The inconvenience growing out of the admission of previous publications have been felt and stated by most of the learned judges who have considered the question, and is too obvious to require illustration. Each prior publication is in effect, as regards the trial, a new libel suit ; for the party against whom it is offered must be allowed to

prove the truth of it, and thereby destroy its influence. The court, then, may have in one suit as many issues to try as there are publications; and in a series of them, the confusion and embarrassment must be obvious, as well as the great injustice to those who are obliged to meet and contest the several articles without previous notice by the pleadings; and after all, as before observed, each may still constitute the subject of a new suit, if in fact libellous.

NEW-YORK,
May, 1834.

Gould
v.
Weed.

The libellous charge complained of in this case imputes to the plaintiff, under very aggravating circumstances, unqualifiedly the crime of being an accessary after the fact to the offence of kidnapping a citizen, and the guilt of perjury in endeavoring to exculpate himself. Now, in what way the previous publications of the plaintiff would tend to explain or mitigate the harshness and severity of this charge, was not attempted to be shown on the argument; and, after an attentive examination of them, I am unable to discover how they can have such effect. The article secondly offered in evidence by the defendant is but the explanation of certain rumors put forth by the defendant, and impeaches nobody. The article first offered retorts crimination upon the character of the defendant, which has no relation to the charge in question, and reiterates the truth of the plaintiff's former explanations, with a denial of charges made or repeated intermediate by the defendant in his paper. There is nothing in either of these articles, so connected with the libel, that its production could afford elucidation, or explanation tending to soften its asperity or mitigate its purpose, unless the repeated and earnest denial of calumnious charges can have that effect. The most that can be said in favour of receiving them in evidence is, that the defendant may be enabled to contend the article charged as a libel was but the return of crimination in mitigation of damages, which we have seen, upon well settled principles is not admissible.

The above view also disposes of the objection that the court refused to admit in evidence the whole of the article in question, with one of the publications of the defendant annexed to it. The fact that it was fixed at the head of the article in the

defendant's paper can make no difference in the application of the rule of law. It is not the juxta-position of the two pieces in the paper, but the relative bearing of the subject matter and the scope of the publications upon each other, which constitute the material consideration, and upon which the question must be determined.

We will not stop to inquire whether the record of the conviction of certain persons for a conspiracy to abduct Morgan was properly rejected or not, as the fact of the existence of such conspiracy was fully admitted by the stipulation which had been read in evidence. This was all that could be material for the defendant, to enable him to prove that the plaintiff was a participator in that outrage before or after the fact.

The judge was right in rejecting the evidence offered to justify portions of the article other than those relied on, and to which the claim for damages was expressly restricted. If the plaintiff could thus abandon a part of the claim, and narrow the ground of litigation to a definite charge, (and the right to do so has not been denied,) it follows that the case is not to be involved, at the option of the defendant, with a consideration of the matters thus waived. They are no part of the issue. The whole article may be read by either party, for the purpose of ascertaining the force and effect of the portion for which damages are claimed; and if the plaintiff has waived the more grave and serious charges against his character, and relied for damages upon charges less injurious, this may constitute a legitimate topic of remark, by the counsel for the defendant, to the jury, and in which will usually be found, by the result of the verdict, a full equivalent for any advantage the plaintiff may be supposed to have gained. 21 Com. Law R. 393.

The testimony that the $100 advanced by the plaintiff and received by the witness, in Albany, was paid to one of the kidnappers of Morgan to enable him to escape from justice, was also properly rejected. There is no principle or reason which will hold the plaintiff responsible for the appropriation of money to an unlawful purpose, by a third person over whom he had no control, and without his knowledge or assent.

There was not only no evidence tending to prove such knowledge, but the evidence of both the witnesses in relation to this sum of $100 goes to repel any such inference.

New trial denied.