WILLIAM E. FISH, Respondent, v. ST. LOUIS
COUNTY PRINTING & PUBLISHING COM-
PANY, Appellant.

St. Louis Court of Appeals, May 12, 1903.

1. **Libel:** COUNTER LIBEL IN EXPLANATION THEREOF: IF
RELEVANT, PRIVILEGED. One who has been defamed by the
publication of a libel may defend himself by denying or explaining
the libelous matter, and if the explanation is pertinent and relevant
to the first libel, it will be privileged, though it slanders the author
of the prior publication.

2. ———: A COUNTER, LIBELOUS ARTICLE, PRIVILEGED,
WHEN. Unless the article published in answer to the libel con-
stitutes a denial or is pertinent to and explanatory of it, it is not
privileged, therefore the articles published by defendant not being
a denial or explanation of the prior libelous articles, but an irrele-
vant attack on the personal and professional character of plaintiff,
are not privileged.

3. ———: ———: ———: COUNTER LIBELOUS ARTICLES, AD-
MISSIBLE IN MITIGATION OF DAMAGES: MALICE. Though
plaintiff's previous libelous articles concerning stockholders of the
defendant paper, defamatory of their honesty and conduct as county
officials, do not render privileged defendant's article, which is not a
denial or explanation of the previous articles, but an irrelevant
attack on the personal and professional character of plaintiff, they
may be considered in rebuttal of any inference of malice, and in
mitigation of damages.

4. ———: LEGAL MALICE IN LIBEL OR SLANDER INFERRED.
Legal malice, which is sufficient to sustain an action for a libelous
article, not privileged, may be inferred from the article being libel-
ous and false and untrue.

5. ———: REBUTTAL EVIDENCE, WHEN PROPER. Plaintiff, in
an action for libel, having offered no evidence of loss of profits in
business, defendant can not show that plaintiff had no such loss.

6. ———: LICENSE TO PRACTICE LAW: HOW IMPEACHED.
The granting of a license to practice law is an exercise of judicial
power, and can be impeached only by what may affirmatively appear
on the face of the record.

Appeal from St. Charles Circuit Court.—*Hon. E. M. Hughes,* Judge.

REVERSED AND REMANDED.

*Kiskaddon & Matthews* and *R. Lee Mudd* for appellant.

(1) Among the several kinds of "privileged communications," a common definition of the one here claimed is "where the publisher acted in good faith, in discharge of a public or private duty, legal or moral, or in the prosecution of his own rights." Hancock v. Blackwell, 139 Mo. 451; Hess v. Ganz, 90 Mo. App. 448; Meysenberg v. Englike, 18 Mo. App. 350; 3 Lawson's Rights and Rem., sec. 1228; Starkie (Faulkard) on Sland., p. 259; Townshend on Libel and Slander (4 Ed.), sec. 240. (2) It bears much the semblance of a prosecution for disturbance of the peace in a case in which both sides were "ready for battle;" and there the principle applies, "the party complaining must not himself have provoked the alleged disturbance; he must be in the peace himself." Kelley's Cr. Law (2 Ed.), p. 633; State v. Lund, 49 Mo. 90; State v. Blumley, 53 Mo. App. 130. (3) "When both parties are *in pari delicto* neither of them should be encouraged in a claim for damages." 28 L. R. A. 722, notes. Merely giving the names of the authors, or the publishers, in libel cases, as contradistinguished from oral slander, we know is no defense; and hence the materiality of such testimony as here excluded is obvious. Hawkins v. Globe Printing Co., 10 Mo. App. 179; Meyrose v. Adams, 12 Mo. App. 332.

*G. N. Fickeissen* for respondent.

(1) In the case of Brewer v. Chase, 121 Mich. l. c. 533, the cases on this question are all carefully considered and the court says: "It must not be supposed

that when a libelous article is published the person libeled is at once authorized to publish any and all kinds of charges against the offender, upon the theory that they tend to degrade him and thereby discredit his libelous statements. If this were so, every libel might be answered in this way, and the most disgraceful charges made, the person making them sheltering himself behind his belief in their truth. In this it is observable that the rule limits the privilege to retorts which are necessary to the defense, or fairly arise out of the charges made." Odgers, L. & S., 228; Newell, S. & L., p. 519, sec. 120. (2) The criticisms set out in defendant's answer referred to certain acts of county officials and matters of politics. It was no attack, direct or indirect, on the defendant, and defendant could not step into the shoes of "its friends," as they are called in the testimony, and still claim "privilege" or "provocation." Hess v. Gansz, 90 Mo. App. 439. On this point it is said in Weston v. Grand Rapids Pub. Co., 87 N. W. 258: "Articles published by plaintiff, as editor of a rival paper, reflecting on the stockholders of the defendant company, none of which related to the same subject-matter as that contained in the libel complained of, and to which the libelous article could not be deemed a reply, were inadmissible to show provocation or to excuse the libel." (3) General damages may be recovered in the absence of actual proof, and an instruction importing that direct evidence must be offered establishing actual damages before a verdict may be given therefor, is not a correct statement of law. Recovery can not be limited to pecuniary loss of plaintiff. Hearne v. DeYoung, 132 Cal. 357; Lovejoy v. Whitcomb, 174 Mass. 586; The Norfolk v. Davis, 12 Appeal Cases (D. C.) 306.

BLAND, P. J.—This suit originated in the circuit court of St. Louis county. The venue was changed to the county of St. Charles, where a trial resulted in a

verdict for plaintiff for $500 actual damages. From the judgment entered on this verdict defendant appealed. .

Omitting caption and signature, the petition is as follows:

"The plaintiff, William E. Fish, for his cause of action in the above entitled cause states: That the defendant, the St. Louis County Printing and Publishing Company, is a corporation, duly organized under the laws of the State of Missouri and is engaged in the publishing of a newspaper called the St. Louis County Advocate. That said defendant on the 31st day of January, 1902, published in said St. Louis County Advocate certain false, defamatory, malicious and libelous language of and concerning the plaintiff, as follows, to-wit:

### WILLIAM E. FISH, AS A REFORMER.

#### LET THE CALCIUM LIGHTS FLASH, AND THE TRUTH BE TOLD.

Shady Transaction of a Clayton Attorney Alleged by His Clients and Supported by their Affidavits—Moneys Paid Him Retained, and Moneys Collected Never Paid Over—His Future Status as an Attorney and Officer of the Court to Be Determined.

When a man, like William E. Fish, who lives in a glass house, undertakes to pose before the people of this county as a political reformer, and recommends the formation of new party, it is well and opportune to inquire: "Who is William E. Fish?" When a man of the species of William E. Fish, who has skeletons in his own closet, undertakes by innuendo to malign and cast odium upon the fair name and character of public officials, and intimates that the "administration of the affairs of this county is rotten to the core," it is high time to strip the mask of hypocrisy from the face of this man and turn on the calcium light that the people may judge. When a man of this stripe and calibre of William E. Fish, who should first *wash his own* dirty linen, undertakes to criticize honest and respectable citizens and defames his colleagues at the bar, behind their back, the time has come to clean the job up forever and amen, politically and otherwise.

For some time the singular and queer transactions of this man Fish have been an open secret in this community, and reports have reached us which must, if true, put the stamp of condemnation and public disgrace upon the fellow, but we forbore comment, and were reluctant to publish the damaging reports which were being circulated

Fish v. St. Louis County Printing & Pub. Co.

concerning him by respectable and reputable persons who had been his clients. We were averse to giving them publicity, solely out of respect and pity for his wife and children, but since he has had the presumption and temerity to render suspected, honorable and upright officials and men, who are our intimate friends, we propose to let his clients speak, who claim to have been duped and defrauded by this great critic, this bogus reformer and foul innuendus, while acting as their attorney, and to that end we publish below their sworn affidavits, the originals of which we are requested to hand Judge McElhinney in order that proper steps may be taken in determining his future status as an attorney and officer of the court:

### THE AFFIDAVITS.

State of Missouri, city of St. Louis, ss.

Carter S. Lyons, of lawful age, being duly sworn upon his oath, makes affidavit and says that he engaged one William E. Fish, an attorney at law, of Clayton, Missouri, to bring a divorce suit, and paid the said Fish the sum of ten dollars as a retaining fee, of which the following is a receipt for said payment: ."Received of Carter S. Lyons ten dollars for legal services for obtaining divorce in suit of Lyon v. Lyon. (Signed) William E. Fish." That said Fish took no steps towards instituting said suit, but soon thereafter demanded of affiant the further sum of ten dollars, which said sum affiant paid to said Fish, but that the said William E. Fish, notwithstanding said last payment of ten dollars, making twenty dollars in all, was paid during the month of July, 1898, did not at that time and never has taken any steps or rendered any services in the prosecution of the suit, which he was retained to bring, that subsequently, to-wit: In the month of November, 1898, affiant demanded of said Fish the return to him of the money above referred to, but that the said Fish failed and refused to return the same, or any part thereof.

CARTER S. LYONS,
3211 LaSalle Street.

Subscribed and sworn to before me this 21st day of January, A. D. 1902. My term expires October 2, 1903.

(Seal.)                          HY. G. OHEIM,
Notary Public, City of St. Louis, Mo.

State of Missouri, county of St. Louis, ss.

Be it known that on the twenty-eighth day of January, 1902, personally appeared before me Solomon Marks, of lawful age, who, being duly sworn, deposeth and saith, that on or about the twenty-fourth day of April, 1901, he presented a petition to the county court of St. Louis county, Missouri, for a license to keep a saloon in St. Louis county, Missouri, and in the forenoon of that day lawyer W. E. Fish appeared before the court and asked that the court lay the petition over for one week, as he had a remonstrance to said petition, and that there were two men at his house the night before (Sunday night), Henninger and Lee;

as remonstrators. "During the noon hour I was advised to see Fish. And on seeing Fish, he demanded of me $25, and he would withdraw the remonstrance," and that he, Marks, then and there paid said Fish $25. And about one o'clock in the afternoon of said day Fish went into court and told the court there was a remonstrance against Mr. Marks' petition for a saloon, but that this was not the Marks; that it was some other Marks, and that this Marks had a good character, and asked the court to grant this Marks a saloon license, and that everything was all right, and that the court did grant said license, and that he (Marks) made an investigation after the license was granted, and found that there had been no remonstrance at all against his petition for a saloon license by any one. And after I saw Henninger and Lee, they told me they had never known Fish, and they never were in his house at any time, and that what Fish told me about a remonstrance against me was not true. SOLOMON MARKS.

Subscribed and sworn to before me this 28th day of January, 1902. My term of office expires December 12, 1904. ROBERT SHACKLEFORD,
(Seal.) Notary Public St. Louis County, Mo.

State of Missouri, county of St. Louis, ss.

On this 29th day of January, 1902, before me, a notary public, in and for the county aforesaid, came A. J. Signor, who, being duly sworn, on his oath says: "I am a resident and citizen of St. Louis county. About October ...., 1900, I desired to dispossess one Chicktanuz, a tenant, and for that purpose went to Clayton to engage an attorney to prosecute the matter. While in Autenrieth's saloon I was referred to William E. Fish as a lawyer who would act for me in the matter. After a little while I found Fish and went to his office with him. After stating the case to him, Fish said he would undertake the matter for a fee of twenty-five dollars. I thereupon paid him ten dollars on account of his fee and went home. Soon thereafter I received a letter from Fish stating that my tenant would remove from the premises for the sum of fifty dollars. I thereupon went to Clayton and paid Fish fifteen dollars balance on his fee and also the sum of fifty dollars to be by him paid to said tenant. Some time thereafter my said tenant informed me that he had not received the fifty dollars from Fish, so the next morning I went to Clayton to see him. I found Fish was laid up at home by reason of an accident; so I and my brother went to Fish's house to see him. I asked Fish about this fifty dollars. Mr. Fish told me that the money was in the Boatmen's Bank. My brother suggested that he give me a check for the money, but Mr. Fish told me that the bank would not pay the money on a check. It was then suggested to him that he could let his wife draw the money, but Fish said that they would not even pay it to his wife, but only to him personally. We thereupon left his house and I went to the bank and drew fifty dollars of my own money and paid the tenant therewith and got him off the place. I saw Fish again about this fifty dollars and he said that just as soon as he could get to town he would get the money for me. I have often asked him for the

money since, but he has never paid it to me and the same is still due and owing to me from said Fish."          A. J. SIGNOR.

Subscribed and sworn to before me this, the 29th day of January, 1902. My term expires January 30, 1903.          B. C. STEVENS,

(Seal.)          Notary Public for and in St. Louis County, Mo.

This is the same William E. Fish, who, in an article written for the old Bolter of the Watchman on the tenth inst., used the following language: "They of course can, as any railroad company can, *condemn your land, or my land,* by paying us a reasonable value therefor." Where, ye gods and little fishes, is William E. Fish's land? This cheeky individual appears upon the tax books of 1900 with a tax of $2.30, and on those of 1901, with a tax of $1.15, all on personal property, *and still unpaid,* and then prates about "his land." This is the same William E. Fish who is recommended by the bolting Colonels and corners to clients looking for a *reliable* attorney, while reputable and competent gentlemen of the legal profession in this town are ignored. People "judge men by the company they keep," and this true remark applies also in this instance very properly and pertinently. It remains to be seen whether William E. Fish has still the indorsement of the Colonels and Corners after Judge McElhinney and the bar of St. Louis county have acted upon his case. We say, *Let the Calcium Light Flash on Them!*

"Plaintiff states that the said publication then and there did and still does tend to provoke him to wrath and expose him to public hatred, contempt and ridicule, and has deprived him of his income as an attorney at law, and will deprive him of said income and earnings for a long time to come, and to also deprive him of the benefits of public confidence and social intercourse, and that the same was willfully, wantonly, and maliciously published and circulated among a great number of persons in St. Louis county and the city of St. Louis to the great damage to the plaintiff.

"The plaintiff now further states that by reason of said false, defamatory, and libelous publication against him he has been actually damaged in the sum of five thousand dollars, and that because of the willfulness, wantonness, and malice of said publication he ought to have and recover of the defendant a further sum of five thousand dollars as punitive damages in the premises.

"Wherefore, now the plaintiff asks judgment against the defendant for the sum of five thousand dollars as his actual and compensatory damages, and for the further sum of five thousand dollars against the said defendant as punitive damages, and for his costs."

The answer is as follows:

"The defendant, The St. Louis County Printing and Publishing Company, now by leave of court, for amended answer to the petition of plaintiff, William E. Fish, says the defendant admits the publication of the article alleged and set forth in said petition, but defendant denies that said publication was done with malice and denies each and every other allegation in plaintiff's petition which may not hereinafter be admitted.

"For other and further answer and defense defendant says that the statements in said article, which plaintiff alleges in his petition to be libelous are, in fact true.

" [For further answer and defense, defendant says that at the time of the publication of said alleged libelous article, and for months next prior thereto, the newspaper known as the St. Louis County Advocate, in which said article was published, was partly owned by and its editor employed by some of the persons who had been elected as county officials of St. Louis county, in the State of Missouri, at a general election prior thereto and were then such officers, holding their respective positions in the courthouse of said county, and were members and stockholders of said defendant corporation; that on the tenth day of January, 1902, shortly prior to the time of said publication, the plaintiff signed and caused to be published in another newspaper in said county, that is to say, the St. Louis County Watchman, a censorious and defamatory article and criticism in reference to county officials of said county, by indefinite allusion, without naming or indicating to which of said officials the said article was or was not intended by him

to apply, which last-mentioned article, signed and caused to be published by plaintiff, among other things accused by said indirect allusion such county officials and owners and stockholders of said St. Louis County Advocate of being promoters of and having great interest in the Central Belt Railroad in said county, in the matter of obtaining remonstrances against another railroad, called the St. Louis Terminal Railway, in said county, and therein avowed his belief that the county court of said county did not know whether said alleged promoters had money enough to build a plank walk around the courthouse of said county or not, and in which said last-mentioned article plaintiff advised and advocated the granting of special privileges by said court to said Terminal railway; and, furthermore, in addition to said last-mentioned article, he, the plaintiff, on said last-mentioned date, caused to be published in another newspaper, the Clayton Argus, in said county, another abusive, untrue and defamatory article, in which he accused county officers of said county, by said like indefinite and indirect allusion, of maintaining and exercising a bad and corrupt county government of said county and of running a certain newspaper (meaning thereby said St. Louis County Advocate) to abuse, in said paper, honest citizens who did not think politically as said officers did; and further intimated and insinuated in said last-mentioned article that said officers' only objects in campaigning for and obtaining public office were to procure money through disreputable political methods, and without performing official services therefor; and in regard to the aforesaid accusations, plaintiff in said article said, 'I know whereof I speak;' and further stated therein that good officials in said county were exceedingly few, and he therein advocated generally political reform by the defeat of the most of the county officers of said county; that said articles were produced and caused to be published by the plaintiff willfully and designedly as censorious,

prejudicial and unduly defamatory criticisms of said officers and said St. Louis County Advocate, its editor and said owners thereof, and both said articles were designed by plaintiff to call public attention to his own grievances and those of his assumed class by wrongfully disparaging said persons and newspaper through motives of jealousy and ill will; and thereupon, by reason of said two articles, the plaintiff's credibility and honesty, and, in connection therewith, his motives in relation to said matters became and were at the time of the publication of said alleged libelous article, and are now, matters of public interest and comment, and defendant had and still has the rightful interest and privilege to write and publish with impunity the said alleged libelous article in comment on and condemnation of the same, and the conduct and motives of the plaintiff in regard thereto, and that the defendant published said alleged libelous article in good faith, in reasonable defense of its aforesaid newspaper and said public officials and county government against plaintiff's said articles; and that said alleged libelous article was only a rightful exercise of that privilege.

"For further answer and defense defendant states that the certain abusive, unfair and defamatory articles aforesaid, which the plaintiff caused to be published in the respective newspapers, to-wit: The St. Louis County Watchman and the Clayton Argus, in said county, on said date of January 10, 1902, in abusive, untrue and offensive defamation of the said newspaper, the St. Louis County Advocate, its editor and some of the stockholders and owners thereof, and county officials of said county as aforesaid, constituted directly a sufficient unwarranted provocation to the defendant for the publication of said alleged libelous article, and the same would not have been so published if plaintiff had not first published the two articles aforesaid.]

"For further answer and defense defendant stated that for some time before and up to the time of defend-

ant's publication of the said alleged libelous article the defendant had heard divers and many general and particular rumors and reports from credible persons in the neighborhood of plaintiff's residence that plaintiff had become and continued to be a practitioner of law by deceptive and delinquent methods without compliance with the prescribed legal requisites, and had been guilty of unfaithful demeanor, malpractice, deceit and misdemeanor in his said practice and professional capacity as such practitioner of the law, and particularly that he improperly obtained and retained money from his clients, and had been guilty of threatening and originating fictitious and bogus demands and litigation proceedings to extort money thereby; that before publishing said alleged libelous article the defendant had seen, read and copied affidavits to facts of the same kind and substance set forth in said alleged libelous article, and the copies purporting to be of affidavits set forth in said alleged libelous article copied in plaintiff's petition are true copies of genuine affidavits of the persons therein indicated, which the defendant had notice of as aforesaid, made shortly before said alleged libelous article was published, and that these reports, together with the attendant circumstances, caused the defendant and said editor and stockholders and owners of said newspaper to believe, and furnish them with reasonable cause to believe, that the charges made against the plaintiff in said alleged libelous article were true.

"Having fully answered, defendant asks to be discharged with its costs."

On motion of plaintiff all that part of the answer embraced in brackets was stricken out by the court.

The reply was a general denial of the new matter in the answer.

Plaintiff, before the introduction of any evidence, on motion of the defendant, elected to rely on the injury to his reputation as a lawyer for the recovery of damages.

It appears from the evidence that for some time previous to the publication of the alleged libel there had been trouble in the ranks of the Republican party, in the county of St. Louis, one faction, of which it seems plaintiff aspired to be a leader, was opposed to the regular organization and was called ''bolters'' and ''corners.'' The officeholders of the county, including the county judges, were supported by and affiliated with the regular organization. Most of the stockholders of the defendant corporation were county officers.

On January 10, 1902, plaintiff prepared and procured to be published in the Clayton Argus, published in St. Louis county, the following article:

''Fishing for a Party.—A Correspondent Who Believes the County to be Under a Worse than Nesbit Rule. —Goes For That 'Bad Man' Essen, and Wants a New Political Swim.

''We surely have our bad government in plenty right here at home in St. Louis county. A certain number of officeholders, and I believe they are a majority, buy a paper, run it for their individual interests, do all their legal advertising in said paper, abuse those honest citizens who do not happen to think as they do politically, and divide up the profits. The good old Republicans of this county have seen an honorable old party, go from year to year into the hands of a few ring politicians, who would vote and work for any old ticket or party so long as they could get into office and get a good big fat salary for doing nothing—and let their deputies do that.

''There are some good officials in the courthouse, but they are awfully few.

''If there are good men, they would not lose their jobs under the Citizens party, for they are the kind of men the Citizens party want in office. So you, good Republicans and honest Democrats, let us get together.

I would like to hear through your paper, what the people think of the coming Citizens party.''

On the same date he furnished to and had published in the St. Louis County Watchman, a newspaper, the following article:

''COMMUNICATED.

''Clayton, Mo., January 7, 1901.—Another belt line company springs into the arena; a company calling themselves the Central Belt Line Company, and composed of the Lord knows who, for I don't believe the county court knows to-day, whether these men, who are the promoters of this scheme, have money enough to build a plank walk around the courthouse, or not. But those who are watching developments in this railroad business, are full convinced that some of our county officials are very much interested in the Central Belt Line Company, by the great interest these same officials took in obtaining the franchise and in getting remonstrances against the Terminal Railroad Company. Now, what is the great purpose of these Central Belt Line Promoters? Is it a clear case of hold up to compel the Terminal people to buy their franchise, etc.?

''WILLIAM E. FISH.''

On the appearance of these articles the defendant took up the editorial cudgel in defense of its political friends and the stockholders of the company. And believing the most effectual defense that could be made would be to destroy Fish's character and influence, proceeded to show him up ''in his true colors.'' The defendant's editor had heard of rumors of the alleged shadowy transactions Fish had had with his clients which are set forth in the several affidavits published by defendant. Before turning its batteries loose on Fish the defendant verified these rumors by procuring the affidavits and then published them.

In addition to the libelous articles set out in the petition, defendant published the following article:

"Severns could tell a fish story.—Fish's appointments held up.

"William Severns tells a fish story that took place in Evansville, Ind., in December last, involving a sum of money ranging from $600 to $1,000. He is getting ready to substantiate by affidavits."

In respect to the matter alluded to in this article, Signor testified at the trial that Fish represented to him that an old negro in the neighborhood had dug up $7,000 in United States bonds, with all the coupons attached; that these bonds could be purchased at a very large discount; that he induced him (Signor) to loan him $1,200 for the purpose of purchasing the bonds; that after procuring the money Fish told him he took the bonds to New York and went, in company with a broker, to a bank and presented the bonds; that they were pronounced counterfeit by the bank officials; that he was then watched by detectives and for fear of being arrested threw all the bonds but one in the Mississippi river on his return home; that he took the one he had retained home with him and secreted it, but discovered that the detectives were still watching him and he burned it up for fear of being caught with it in his possession; that he (Signor) had never seen any of the bonds and had never been able to get any of his money back from Fish.

Fish denied this story *in toto*. The parties, who made the several affidavits contained in the publication, testified to the truth of their contents. Fish, either by denial or explanation, cleared up his conduct in respect to all the matters contained in the affidavits except the one made by Marks. He admitted the substance of what is contained in the Marks affidavit, but undertook to excuse himself by an explanation, which does not explain or excuse his unprofessional and deceitful conduct by which he obtained a small fee from Marks.

Plaintiff introduced evidence tending to prove that prior to the publication of the libelous article, his character as a lawyer was good. Defendant's evidence tends to prove that it was not good. Defendant offered to prove that plaintiff, while living in the city of St. Louis, applied and obtained license from the circuit court of Gasconade county. The court excluded this evidence. Plaintiff testified, in respect to his license, that when he applied he was actually living in the city of St. Louis, but had rented a house in Clayton with the intention of moving to that city and engaging in the practice of law.

The editor of defendant's paper testified that after seeing the articles of Fish in the Argus and the Watchman and after hearing that Fish had spoken disrespectfully of attorneys Shackleford and Matthews, he "went for him." After "attacking my friends I thought we ought not let the stigma rest on us, personally or on the paper, either; it ought to be answered, and Mr. Fish's credibility ought to be impeached."

There is evidence in the record that plaintiff had spoken disparagingly of the professional conduct of both Shackleford and Matthews, but he emphatically denied the remarks attributed to him concerning them.

That part of the article which referred to plaintiff as a "political reformer" to his "living in a glass house," and as "having skeletons in his closet," were waived as was also the innuendo that plaintiff's articles contained innuendoes upon the county administration.

1. Defendant complains of the action of the court in striking out a part of its answer. The part stricken out stated the substance of Fish's articles published in the Argus and the Watchman, alleged these articles to be libelous and that they were published of and concerning some of the stockholders in the defendant corporation. Under the claim of privilege to answer these alleged libels, defendant claims justification in the publication of its article. It is certainly the law that one defamed by the publication of a libel has the right and

privilege to defend himself by answer, denying or explaining the libelous matter, and if the explanation is pertinent and relevant to the first libel it will be privileged, though it slanders the author of the prior publication. Odgers on Slander (2 Ed.), p. 175; Newell on Slander and Libel, secs. 120-21; Brewer v. Chase, 46 L. R. A. 397; s. c., 121 Mich. 526. But this privilege extends no further, and if it be conceded that the articles published in the Argus and the Watchman are libelous and were concerning some of the stockholders in the defendant corporation, the defamation was of their personal honesty and conduct as county officials. The article published by defendant is not a denial or explanation of the Argus and the Watchman articles, but is an irrelevant attack upon the personal and professional character of the plaintiff and is therefore not privileged. But we think that the matter stricken out was proper to be considered in mitigation of the damages, on the theory that the Argus and the Watchman publications provoked the publication of the alleged libel against plaintiff, and was also proper to be considered for the purpose of weakening the inference of malice.

In Duncan v. Brown, 15 B. Mon. 186, it is said: "Circumstances of the provocation which are insufficient to justify may yet by weakening the inference of malice, palliate the publication of slander or libel and may operate to mitigate the damages to be recovered for it."

And in Hartford v. State, 96 Ind. 461, it is said that in criminal as well as in civil cases the fact that a libel was provoked by a prior libel, to which it replies, may be shown to mitigate the offense. Other cases holding the same doctrine are Shattuc v. McArthur, 29 Fed. 136; Thomas v. Dunaway, 30 Ill. 373; Hotchkiss v. Lothrop, 1 Johns. 286; Knott v. Burwell, 96 N. C. 272; Massuere v. Dickens, 70 Wis. 83.

The right to answer a libel by libel is analogous to

the right to defend one's self against an assault upon his person. The resistance may be carried to a successful termination, but the means used must be reasonable; if they are unreasonable and excessive, the plea of *son assault demesne* will not be available, but the prior assault may be given in evidence in mitigation of damages. The first assault can not be given in evidence in mitigation of damages, if there is time between the first and second assault for the blood to cool. So a prior libel can not be deemed to have provoked a libelous answer thereto, if there was time between the two publications for the blood to cool, nor will the first afford evidence of mitigation. Quinby v. Minnesota Tribune Co., 38 Minn. 528; Gould v. Weed, 12 Wend. 12; Beardsley v. Maynard, 4 Wend. 336.

In the Quinby case it was held doubtful, as to a libel charging a physician with malpractice and published the day after a libel commenting on a brutal jest, if the first libel mitigated the second, as there was time for the blood to cool.

In Beardsley v. Maynard, it was denied that any provocation by a newspaper libel the day before, furnished mitigation for a libel that was not in reply to the former; and in Gould v. Weed it was held that, after a lapse of two weeks, a publication in reply was too late to afford a presumption that it was published under the influence of passion produced by the prior libel.

It would not be competent for the court, under our law which makes the jury the judge of both the law and facts in cases of libel and slander, to declare as a matter of law in what time the publication of a libel would not provoke the publication of a libelous reply. A newspaper libel is put into general circulation. The paper does not reach the eye of all its patrons at the same hour nor always on the same day, and it seems to us that during the period of its circulation the libel would be a continuing provocation to anger. And we think, also, that if the libel concerned the action of officials

having in charge a matter of large public interest, as the granting or refusing to grant a franchise to a railroad company, and its tendency was to excite inquiry and discussion among the people where the paper circulated, that so long as this discussion should continue and the libel continue to be circulated, it would continue to be an irritant, calculated to provoke anger, and that the question of whether or not there had been time for the blood to cool is one peculiarly for the jury. While the matter stricken out of the answer was insufficient to show privilege to the defendant to publish the libel, it was matter that defendant might plead in rebuttal of any inference of malice and in mitigation of damages, and we think the court erred in striking it out.

The defendant asked the following instruction:

"5. The court further declares the law to be that, with reference to the words 'malice' and 'malicious,' as used in these instructions, there are two kinds of malice; the one being what is known as implied malice, or malice in law, and the other express malice, or malice in fact. The first, or implied malice, is the kind that a jury might presume or infer from facts and circumstances in the case, without any direct evidence offered to prove the same; but the second, or express malice, must be shown by some wrongful statements or conduct of a person which prove such malice to the satisfaction of the jury; and you are further instructed that, although an act done because of spite or ill will, would be a malicious act, yet mere dislike, spite or ill will does not constitute malice for the purpose of this case; and even though you should believe from the evidence that at the time the article in question was published, the editor or owners of the St. Louis County Advocate were unfriendly towards the plaintiff and entertained hostile and spiteful feelings toward him; yet, unless you believe from all the evidence that the publication of said article was a wrongful act and that it was done with the intent to injure the plaintiff, and without any legal justifica-

tion or excuse—that is, that said act was either known by the defendant to be wrongful, or that it was done without restraint or reasonable cause, and in reckless disregard of the plaintiff's rights; then you can not lawfully find a verdict for the plaintiff [unless you believe that the said article was libelous and was false and untrue, in which event the law infers malice]."

The court modified the instruction by adding the clause embraced in brackets at the end and then gave it as modified. Defendant objected to the modification. The clause added by the court is a correct definition of legal malice, and legal malice is sufficient to make out this element of the case, provided the publication was not privileged. As we have seen, the libel exceeded the bounds of the privilege of the occasion, and for this reason we think the modification of the instruction was proper.

Defendant offered evidence that plaintiff had lost nothing in business on account of the publication of the libel which the court excluded. Loss of profits in business was a proper element of damages in the case, but plaintiff offered no evidence on this line; that offered by defendant would have been admissible as rebuttal evidence, but as there was no evidence to rebut, the offer was properly denied.

Defendant, with a view to showing that plaintiff had procured his license to practice law in a court that had no jurisdiction to grant it, on cross-examination asked plaintiff a series of questions which were on objection excluded. This ruling is assigned as error. It is conceded by defendant that the granting of a license to practice law is the exercise of a judicial function; as such it is not the subject of collateral attack and can only be impeached collaterally by what affirmatively appears upon the face of the record. Neither the application of plaintiff for license nor any part of the record was offered in evidence. The attack by parol evidence of the judgment of the court in awarding the license was

clearly inadmissible.   Dilworth v. Rice, 48 Mo. 124;
Castleman et al. v. Relfe, 50 Mo. 583; The State v.
Wear, 145 Mo. 162; Railway Co. v. Warden, 73 Mo.
App. 117.

There are other errors assigned in the brief in re-
spect to the exclusion of evidence, but they are not
likely to occur on retrial of the case and for this reason
will not be noticed here.   It is not improper, however,
to remark in this connection that where a plaintiff opens
a newspaper war and sues for libel when he finds he
has got the worst of it, great liberality, within the
bounds of legal rules, should be indulged in the admis-
sion of evidence.

The defendant is entitled to prove all the facts that
provoked or tended to provoke the publication of the
libel, and to search the character of the plaintiff as with
a lighted candle in mitigation of the damages.   Hess v.
Gansz, 90 Mo. App. l. c. 445, and cases cited. The
whole truth of the matter should be brought out, the
better to enable the jury to judge of the law and the
facts and to ascertain how much, if any, damages the
plaintiff ought to recover.

For error in striking out a part of defendant's
answer and in the rejection of evidence the judgment
is reversed and the cause remanded.   *Reyburn, J.,* con-
curs; *Goode, J.,* not sitting.